[Cite as *In re M.H.-L.T.*, 2017-Ohio-7825.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| M.H.-L.T., | : | Case No. 17CA12 |
| | : | |
| A Dependent Child. | | DECISION AND JUDGMENT ENTRY |
| | : | |
| | : | |

APPEARANCES:

Darren L. Meade, Columbus, Ohio, for Appellant.

Kevin Rings, Washington County Prosecuting Attorney, and Amy Graham, Washington County Assistant Prosecuting Attorney, Marietta, Ohio, for Appellee.

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED: 9-19-17
ABELE, J.

{¶ 1} This is an appeal from a Washington County Common Pleas Court, Juvenile Division, decision that granted Washington County Children Services (WCCS), appellee herein, permanent custody of thirteen-year-old M.H.-L.T. R.T., the child's biological father and appellant herein,[1] raises the following assignments of error:

FIRST ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN ITS DECISION TO TERMINATE FATHER'S PARENTAL RIGHTS. THIS DECISION WAS AN ABUSE OF DISCRETION AS THE FINDINGS THAT PERMANENT CUSTODY WAS IN CHILD'S

---

[1] The child's mother did not appeal the trial court's judgment.

> BEST INTERESTS, AND THE AGENCY MADE REASONABLE EFFORTS TO PREVENT CHILD'S CONTINUED REMOVAL, WERE BOTH AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
>
> SECOND ASSIGNMENT OF ERROR:
>
> "FATHER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND THUS WAS DEPRIVED OF HIS RIGHTS TO COUNSEL AND A FAIR TRIAL."

{¶ 2} In March 2014, appellee became involved with the family after it received a disturbing report concerning the child and her family. The report indicated concerns of starvation, deprivation, physical and sexual abuse, and animal cruelty. The report stated that the mother weighed approximately seventy or eighty pounds, was very ill, and could not care for herself. The child reportedly "would smell bad," did not behave or act "right," lied, and stole. Additionally, the child purportedly stated that she hates her father and that he had pulled her by the hair on her head. The report further alleged that the child stated that she wanted out of her home and that she has "a little kid's secret." The report also indicated that the family's animals were starving.

{¶ 3} WCCS Caseworker Karen Seagraves visited the family and found the child's mother to be "very, very thin, frail, [and] gaunt"–almost "like a skeleton." The mother was pacing and wringing her hands. Seagraves was unable to make eye contact with the mother and thought the mother appeared "very nervous and upset." Appellant informed Seagraves that the mother had experienced a mental breakdown. Appellant further explained that he had suffered a traumatic brain injury in a motor vehicle accident.

{¶ 4} Seagraves spoke with the child, who appeared "very nervous and anxious and

guarded." The child asked Seagraves if she could "get [her] in foster care." Seagraves attempted to obtain additional information from the child regarding her desire to enter foster care, but the child seemed "too nervous to give [her] any more details other than she wanted candy and jewelry."

{¶ 5} Seagraves spoke with appellant, and he indicated that the two other adult male relatives who lived in the home created "some issues," such as "throwing remotes and being angry at [the child]." Seagraves left the home that day, but kept the case open and planned to further assess the situation.

{¶ 6} Seagraves visited the home approximately one month later. Appellant advised her that he was "very concerned about the other adults living in the house." Seagraves again found the mother to be "very nervous" and "wringing her hands." Seagraves saw the mother whisper something to appellant, and appellant informed Seagraves that the mother stated that she was "uncomfortable."

{¶ 7} Shortly after Seagraves' second visit, the Washington County Sheriff's Department contacted her to relay concerns that the mother was being abused and that the child was being sexually abused. Seagraves went to the home and met first with the child. The child was "very nervous and excited," and asked Seagraves to follow her "two trailers" away from the house. Seagraves explained that the child believed that cameras were pointed on her house and would record her talking to Seagraves. The child did not verbally tell Seagraves her concerns, but instead, the child wrote with chalk on the concrete, "lies, steals, kills, go to hell." Seagraves asked the child what her statement meant, but the child was "very nervous, very concerned that there were cameras on her, and she wouldn't speak to [Seagraves] much about what had"

happened. A different caseworker completed an interview, during which the child disclosed that she had been sexually abused (but the record does not reflect whether the child identified a perpetrator during this initial interview). Appellee subsequently sought and obtained an ex parte emergency custody order and removed the child from her home.

{¶ 8} Appellee filed a complaint that alleged the child is an abused, neglected, and dependent child and that requested temporary custody of the child. After the parents admitted the dependency allegation, the trial court adjudicated the child dependent and dismissed the remaining allegations. The court additionally (1) found that appellee used reasonable efforts to prevent the child's continued removal, and (2) entered a dispositional order that placed the child in appellee's temporary custody.

{¶ 9} At a May 2015 review hearing, the parties agreed to continue the child in appellee's temporary custody and the court found that appellee used reasonable efforts. The court also pointed out that appellant has failed to sign the necessary releases or to comply with the case plan.

{¶ 10} On October 22, 2015, appellee filed a motion that requested permanent custody. Appellee alleged that the child has been in its temporary custody for more than twelve out of the past twenty-two months and that placing the child in its permanent custody is in the child's best interest.

{¶ 11} On October 25 and 26, 2016,[2] the trial court held a hearing to consider appellee's permanent custody motion. Dr. Paul Andrew Dunn, a neuropsychologist, testified that appellant

---

[2] The court held the permanent custody hearing approximately one year after appellee filed its permanent custody motion due to several continuances, some of which arose after appellant's counsel's unexpected death.

contacted him in March 2015 and advised the doctor that he wanted to be evaluated to ascertain "whether he was cognitively in shape to be able to go back to work." Dr. Dunn stated that appellant did not mention appellee's involvement with the family or that appellee had removed his child from the home. Instead, appellant informed the doctor that appellant's wife and child had moved out of state.

{¶ 12} Dr. Dunn explained that due to the nature of appellant's requested evaluation, he did not perform a mental health evaluation. He related that if he had performed a mental health evaluation, he would have focused "a lot more on personality characteristics." The doctor stated that if appellant had been honest from the beginning about the purpose for seeking the evaluation, he would have approached the evaluation differently. Dr. Dunn testified that he would have informed appellant that he might not be the right person to perform the evaluation. Dr. Dunn explained that he is not a forensic psychologist and that he does not specialize in children and family relationships.

{¶ 13} Dr. Dunn stated that his evaluation revealed that appellant would have problems providing structure and stability. He further indicated that appellant appeared to lack appropriate boundaries. For instance, the doctor explained that appellant called the doctor by his first name and seemed to think of himself "as socially involved" with the doctor, which the doctor found "quite strange."

{¶ 14} Caseworker Seagraves testified that when appellee removed the child, the mother "was very ill" and transported to the emergency room. Seagraves met with the mother the following day. Seagraves found it "astounding" that the mother made eye contact. When Seagraves informed the mother of her surprise, the mother stated that she was able to talk that

day because she had "been drugged up for a year and a half."   The mother claimed that appellant and another male relative had been drugging her by forcing her to take five to seven diazepam pills.   The mother further reported that (1) appellant "was very controlling with the food," (2) she and the child "would have to ask permission to get into the refrigerator [and] to use toilet paper," (3) appellant "was very violent with her after he had his traumatic brain injury," and (4) appellant "would pull her [and the child] by the hair of the head."   The mother indicated that she "had a mental breakdown" from worrying about appellant sexually abusing the child.   Seagraves stated that the mother did not elaborate on the reasons for her concerns.

{¶ 15} Seagraves explained that after the child had entered appellee's temporary custody, she received another report indicating that the child claimed her aunt had sexually abused her. The child stated that the aunt had taken pictures of her naked.   The child also reported that (1) appellant would enter her bedroom during the night and touch her vagina, (2) appellant "licked" her on her mouth, and (3) in 2013, appellant penetrated her vagina with his fingers.

{¶ 16} Caseworker Amanda Herron testified that the child has been in the same foster home since her removal.   Herron explained that after the child's removal, appellee referred the child for mental health counseling "based on concerns about her extreme fear of" appellant and "her brother."   Herron related that the child "was very, very afraid, fearful of seeing" her father and brother.   Herron stated that the child was so fearful of appellant that appellee did not provide appellant with visits until the child met with a mental health counselor who could recommend how to approach visits in a way that was emotionally safe for the child.   Herron testified that the child's first visit with appellant occurred approximately two months after the child's removal from the home.

{¶ 17} Herron stated that the child has ADHD, displays defiant behavior, and suffers from anxiety. Herron indicated that the child takes medication for anxiety, ADHD, and mood regulation. Herron testified that the child exhibits some compulsive behaviors, such as hand washing, a preoccupation with germs, and hand sanitizer. Herron related that the child also engages in  sexualized behaviors, such as masturbation. Herron stated that the child would put water in her vagina because it felt "dry" and "weird."

{¶ 18} Herron further explained that the child "has some very, very difficult behaviors." Herron related that the child (1) refuses to clean her room or do her homework, (2) has been in altercations with school staff, peers, bus drivers, and the foster parents, (3) had an isolated incident of smearing feces in the bathroom, and (4) urinated in cups in the foster home and left them around the house. Herron additionally indicated that the child "had a very distinct and * * * unwavering fear that demons were out to get her." Herron stated that the child's fear "actually became debilitating * * * at times."

{¶ 19} Herron discussed appellant's case plan compliance. She stated that appellant completed a parenting education class, but she is not familiar with it. Herron testified that appellant did not complete a mental health evaluation and that he refused to sign releases, signed them "[v]ery begrudgingly," or would revoke previous releases. Herron explained that between November 2014 and April 2015, appellant revoked prior releases and told caseworkers not to perform any home visits. Herron stated that appellant indicated that he wished to speak with an attorney.

{¶ 20} Herron testified that completing a mental health evaluation "was the single most important part of the case plan as a whole,"  especially in light of the physical abuse, starvation,

deprivation, drugging, and sexual abuse allegations.   Herron explained that a mental health

evaluation would have provided an opportunity to assess the allegations and to have insight into

the behaviors.   She stated that without a mental health assessment, appellee could not develop a

course of action to attempt reunification.   Herron indicated that a mental health assessment

would have permitted appellee to develop a plan to address the potential safety issues in the

home and to prevent them from reoccurring.   Herron testified that she repeatedly informed

appellant of the importance of obtaining a mental health evaluation and that "[i]t was not a lack

of understanding on his part by any means."   Herron related that after she received Dr. Dunn's

report, she advised appellant "that the assessment that he got was not what we asked for."

{¶ 21} Herron testified that although Dr. Dunn evaluated appellant, appellant "did not

participate in an evaluation that would have been worthy for addressing the safety concerns in his

home."   Herron explained that Dr. Dunn's evaluation was not helpful in developing a proper

course of action.   Herron additionally found it "extremely concerning" that appellant did not tell

the doctor of appellee's involvement.

{¶ 22} Herron agreed that appellant had positive interactions with the child during the

structured setting of the visitation center, but pointed out that Dr. Dunn indicated that appellant

would show difficulty outside of a structured environment.   She further noted that appellee

received no indication that appellant could safely parent outside of a structured environment.

{¶ 23} Herron explained that appellee never considered out-of-agency visits due to "the

severity of the allegations in this case * * *.   We had humans and animals being starved.

Animals dying. * * * * We had the child being the recipient of some of that deprivation.   She

was very thin, compared to what she appears now."   Herron indicated that before considering

out-of-home visits, appellee needed to evaluate whether appellant was cooperative and whether he acknowledged the child's problems. Herron stated that appellant attributed the child's problems to "being bullied at school" and did not seem to understand why appellee removed the child from the home. Herron stated that appellant kept repeating that the criminal charges based upon the sexual abuse allegations were dismissed and believed that appellee's continued involvement was therefore unwarranted. Herron recognized that the sexual abuse allegations were unsubstantiated, but she stated that the lack of substantiation does not mean that appellee lacked cause for concern. Herron explained that "in order for the Agency to substantiate, it is required that they have either physical Forensic evidence or an admission from the perpetrator."

{¶ 24} Herron further related that appellee did not attempt home visits due to appellant's failure to obtain a mental health evaluation. Herron explained that the mental health evaluation would have enabled appellee to assess whether appellant is a "safe person."

{¶ 25} Herron testified that she spoke with the child, and the child revealed that she feels safe in the foster home, but she does not feel safe in her own home. Herron indicated that the child wants to stay in the foster home but still be able to see her parents.

{¶ 26} Herron explained that the child's needs are complex, and if appellee were to place her in a new home, "we would go straight to a therapeutic foster home for her." Herron testified that the child "requires a very high level of care, a high level of supervision," and she does not believe that appellant can provide the child with the care she needs. Herron believes that placing the child in appellee's permanent custody is in the child's best interest. Herron explained that she does not believe it is safe for the child to be returned to appellant. She further related that the child's mother has a legal guardian who helps the mother meet her basic needs

and that the mother would be unable to provide for the child's needs.

{¶ 27} The child's foster father testified that the child has continuously been in his home since her May 2014 removal. The foster father stated that the child told him that appellant touched her "inappropriately" and pointed between her legs. He stated that even though the child has serious behavioral and emotional issues, he and his wife would be willing to adopt the child.

{¶ 28} Licensed Professional Clinical Counselor Tracy Waite testified that she first encountered the child in May 2014. She explained that part of her evaluation included a sexual behavior inventory that is used to substantiate sexual abuse. Waite stated that the child's total score was 96. She related that "anything over 65 is considered clinically significant and correlated with a potential probability of the child having gone through some kind of sexual abuse." Waite believed that based upon her assessment of the child "that there is sexual abuse somewhere in her background from someone."

{¶ 29} Waite explained that during her sessions with the child, the child displayed "a lot of anxiety." The child talked about what occurred at her home and referred to it as "bad stuff." The child "talked about animals dying" and stated that "her brother was mean to animals" and to her. During the first session shortly after the child's removal, the child asked whether appellant still was in jail, and Waite informed the child that he was. The child stated that she was "glad" appellant was in jail so she would not "have to worry about him hurting [her] again." The child did not, however, indicate precisely why she was afraid that appellant would hurt her.

{¶ 30} The child also disclosed that her aunt took pictures of her on a waterbed and stated that appellant and her aunt "had done some bad things to her." The child did not want to

discuss any specifics of her allegations, but she stated that appellant "was probably just putting medicine or cream on me." Waite questioned the child a bit more, and the child stated that "it wasn't his fault. That Mom was often sick. She was in bed. So he had to do it, because Mom was sick and couldn't come out." The child stated that "she was embarrassed that those things happened" and "embarrassed to talk about it." Waite explained that the child "didn't like having pictures taken of her or being touched down there, and she used her hand to point between her legs. And then she said and sometimes it hurts. And then she said Dad touched me down there, and she pointed between her legs again." The child also stated that she did not "understand why she was taken from Mom. She said Mom never did anything." The child stated that she felt "uncomfortable talking about this, and that was the end of her discussions about that."

{¶ 31} Waite testified that WCCS caseworkers explained to the child that appellee would be seeking permanent custody. Waite stated that the child "was very worried about her Dad. * * * * She was afraid he would have a heart attack." The child asked Waite and the caseworkers if they "would promise not to tell [appellant] because she was afraid that he would either do something stupid or have a heart attack." Waite indicated that the child "was very concerned." The child also "was afraid that if she didn't go home, her family wouldn't stay together."

{¶ 32} Waite related that the child stated that she feels safe in the foster home, but she loves her parents and still wants to see them. Waite stated that the child wrote a letter to the judge that explained her feelings. The letter states that she "really want[s] to go back" to her parents. The child wrote: "I promise my Dad or Mom will not hurt me. They never did. What I meant, they never will not hurt me again. [sic]"

{¶ 33} Waite testified that the child shares a bond with the foster parents and that since

her placement in the foster home, the child's anxiety has been reduced. She diagnosed the child with ADHD, post traumatic stress disorder with suspected child sexual abuse, and an unspecified anxiety disorder. Waite explained that she believes that the child has been sexually abused and she believes appellant was the perpetrator. Waite further stated that she believes that it is in the child's best interest to grant appellee permanent custody.

{¶ 34} Eric Fowler, the mother's guardian ad litem, testified that he met with the mother the Friday before his testimony and she did not appear "mentally up to coming to Court. Specifically being in the same room with [appellant]." He explained that whenever the mother mentioned appellant's name, "she would break down into tears." Fowler related that the mother stated that she wishes she could have custody of the child, but she also realizes that she was unable to do so. Fowler explained that the mother thus wishes for appellee to have permanent custody of the child and for her to stay in the same foster home, if possible. Fowler indicated that the mother opposes appellant "having custody or even having any kind of visitation outside of supervision." The mother stated that she opposed appellant having custody of the child due to "violence against [the mother and] excessive discipline on [the child]." She further stated that appellant's brother was allowed to discipline the child, "and it was often over the top and abusive."

{¶ 35} The child's guardian ad litem testified that the child loves both of her parents and would like to be able to see both of them. The child did not, however, state that "she wanted to live with either of her parents." Instead, the child indicated that she would like to remain in the foster home, where she feels safe. The guardian believes that the child is "most comfortable in the foster home."

{¶ 36} The guardian ad litem does not believe that returning the child to appellant is in the child's best interest. The guardian ad litem indicated that she has concerns regarding the sexual abuse allegations. The guardian ad litem noted that the child states that "bad stuff" happened at home, but she does not elaborate and does not want to discuss it. The guardian ad litem further explained, however, that her discussions with the child suggest that the child does not feel safe in appellant's home. She believes granting appellee permanent custody is in the child's best interest.

{¶ 37} On March 3, 2017, the trial court granted appellee permanent custody of the child. The court found that the child has been in appellee's temporary custody for more than twelve out of the past twenty-two months, and thus, that R.C. 2151.414(B)(1)(d) applies. The court additionally concluded that placing the child in appellee's permanent custody is in the child's best interest. The court found that (1) the child's guardian ad litem indicated that the child wants to remain in foster care but continue to see her parents, (2) the guardian ad litem recommended permanent custody, (3) the foster family is meeting all of the child's needs and she is doing well, (4) the child needs a legally secure permanent placement, (5) neither parent can provide a legally secure permanent placement, (6) "[t]he risks of returning [the child] to [appellant] are just too high," and (7) the foster family has had the child since May 2014 and is willing to adopt the child. The court additionally determined that appellee used reasonable efforts. This appeal followed.

I

{¶ 38} In his first assignment of error, appellant asserts that the trial court's best interest finding is against the manifest weight of the evidence. In particular, he disputes the trial court's

finding regarding the child's need for a legally secure permanent placement. Appellant contends that he substantially complied with the case plan and thus demonstrated that he can provide the child with a legally secure permanent placement. Appellant points out that he completed a parenting course and he claims that Dr. Dunn's evaluation satisfied the mental health evaluation requirement. He further claims that appellee failed to demonstrate that it used reasonable and diligent efforts to reunify the family.

A

STANDARD OF REVIEW

{¶ 39} Generally, a reviewing court will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *E.g., In re B.E.,* 4th Dist. Highland No. 13CA26, 2014–Ohio–3178, ¶27; *In re R.S.,* 4th Dist. Highland No. 13CA22, 2013–Ohio–5569, ¶29.

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).

{¶ 40} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'"'"  *Eastley* at ¶20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *accord In re Pittman,* 9th Dist. Summit No. 20894, 2002–Ohio–2208, ¶¶ 23–24.

{¶ 41} The question that we must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings * * * were supported by clear and convincing evidence."  *In re K.H.,* 119 Ohio St.3d 538, 2008–Ohio–4825, 895 N.E.2d 809, ¶43.   "Clear and convincing evidence" is:

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.  It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases.  It does not mean clear and unequivocal.

*In re Estate of Haynes,* 25 Ohio St.3d 101, 103–04, 495 N.E.2d 23 (1986).   In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof."  *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990); *accord In re Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.") *In re Adoption of Lay,* 25 Ohio St.3d 41, 42–43, 495 N.E.2d 9 (1986).   *Cf. In re Adoption of Masa,*

23 Ohio St.3d 163, 165, 492 N.E.2d 140 (1986) (stating that whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence"). Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. *In re R.M.,* 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013–Ohio–3588, ¶62; *In re R.L.,* 2nd Dist. Greene Nos.2012CA32 and 2012CA33, 2012–Ohio–6049, ¶17, quoting *In re A.U.,* 2nd Dist. Montgomery No. 22287, 2008–Ohio–187, ¶9 ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.'"). Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'" *Thompkins,* 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175; accord *State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶ 42} Furthermore, when reviewing evidence under the manifest weight of the evidence

standard, an appellate court generally must defer to the fact-finder's credibility determinations.

*Eastley* at ¶21.   As the *Eastley* court explained:

> "[I]n determining whether the judgment below is manifestly against the weight of
> the evidence, every reasonable intendment must be made in favor of the judgment
> and the finding of facts. * * *
> If the evidence is susceptible of more than one construction, the reviewing court is
> bound to give it that interpretation which is consistent with the verdict and
> judgment, most favorable to sustaining the verdict and judgment."

*Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984),

fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶ 43} Moreover, deferring to the trial court on matters of credibility is "crucial in a child

custody case, where there may be much evident in the parties' demeanor and attitude that does

not translate to the record well."  *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159

(1997); *accord In re Christian,* 4th Dist. Athens No. 04CA10, 2004–Ohio–3146, ¶7.   As the

Ohio Supreme Court long-ago explained:

> In proceedings involving the custody and welfare of children the power of the trial
> court to exercise discretion is peculiarly important.   The knowledge obtained
> through contact with and observation of the parties and through independent
> investigation can not be conveyed to a reviewing court by printed record.

*Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).

{¶ 44} Furthermore, unlike an ordinary civil proceeding in which a jury has no contact

with the parties before a trial, in a permanent custody case a trial court judge may have

significant contact with the parties before a permanent custody motion is even filed.   In such a

situation, it is not unreasonable to presume that the trial court judge had far more opportunities to

evaluate the credibility, demeanor, attitude, etc., of the parties than this court ever could from a

mere reading of the permanent custody hearing transcript.

B

PERMANENT CUSTODY STANDARD

{¶ 45} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to

a children services agency if the court determines, by clear and convincing evidence, that the

child's best interest would be served by the award of permanent custody and that:

> (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> (b) The child is abandoned.
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 46} Thus, before a trial court may award a children services agency permanent

custody, it must find (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies,

and (2) that awarding the children services agency permanent custody would further the child's

best interests.

C

2151.414(B)(1)(d)

{¶ 47} In the case sub judice, the trial court determined that R.C. 2151.414(B)(1)(d)

applies.   Appellant does not dispute that the child has been in appellee's temporary custody for twelve or more months of a consecutive twenty-two month period.   Instead, appellant disputes the trial court best interest finding.   We limit our review accordingly.

E

BEST INTEREST

{¶ 48} R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interests will be served by granting a children services agency permanent custody.  The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.[3]

---

[3]  R.C. 2151.414(E)(7) to (11) state:

(7) The parent has been convicted of or pleaded guilty to one of the following:

(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;

(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's

{¶ 49} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.,* 113 Ohio St.3d 73,

---

household at the time of the offense;

(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(e) An offense under section 2905.32, 2907.21, or 2907.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(f) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a), (d), or (e) of this section.

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

2007–Ohio–1104, 862 N.E.2d 816, ¶57, citing *In re Schaefer,* 111 Ohio St.3d 498, 2006–Ohio–5513, 857 N.E.2d 532, ¶56; *accord In re C.G.,* 9th Dist. Summit Nos. 24097 and 24099, 2008–Ohio–3773, ¶28; *In re N.W.*, 10th Dist. Franklin Nos. 07AP–590 and 07AP–591, 2008–Ohio–297, 2008 WL 224356, ¶19. However, none of the best interest factors requires a court to give it "greater weight or heightened significance." *C.F.* at ¶57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *In re K.M.S.*, 3rd Dist. Marion Nos. 9–15–37, 9–15–38, and 9–15–39, 2017–Ohio–142, 2017 WL 168864, ¶24; *In re A.C.,* 9th Dist. Summit No. 27328, 2014–Ohio–4918, ¶46. In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016–Ohio–916, 2016 WL 915012, ¶66, citing *In re Adoption of Ridenour,* 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

{¶ 50} In the case at bar, we believe that the record contains ample competent and credible evidence to support the trial court's finding that granting appellee permanent custody is in the child's best interest.

1

Child's Interactions and Interrelationships

{¶ 51} The child loves both of her parents, and both parents love her. The child's mother courageously recognizes her inability to provide proper care for the child and wishes for the child to be placed in appellee's permanent custody.

{¶ 52} Appellant interacted appropriately with the child during his supervised visits at the agency. The child, however, did not initially want to visit appellant after her removal. The

child revealed disturbing allegations that suggest her interactions with appellant while living in the home were highly inappropriate. The mother revealed similar information. The child's counselor detected post-traumatic stress disorder and indicators that strongly suggested the child had suffered sexual abuse. Thus, while appellant may have had some positive interactions with the child during supervised visits at the agency, his interactions with the child in the home, before the child's removal, suggest that he did not have a positive impact on the child's well-being. Moreover, the child stated that she feels safe in her foster home, but did not indicate that she feels safe in the family home where appellant lives.

{¶ 53} The child shares a bond with the foster parents, and the foster parents provide the child with all of her needs. Although the child displays defiant behavior in the foster home and elsewhere, the foster parents have remained committed to the child and expressed interest in adopting the child, if appellee receives permanent custody.

{¶ 54} The foregoing evidence tends to show that the child has experienced positive interactions and interrelationships while in her foster home, but that she did not always have positive interactions and interrelationships in the family home.

2

Child's Wishes

{¶ 55} The child understandably appears conflicted. She loves both of her parents and desperately wants to keep the family unit intact. The child indicated that she feels safe in the foster home and would like to remain there, but she still would like to see her parents. The guardian ad litem believes that placing the child in appellee's permanent custody is in her best interest. *In re S.M.*, 4th Dist. Highland No. 14CA4, 2014–Ohio–2961, 2014 WL 3014037, ¶32,

citing *C.F.* at ¶55 (noting that R.C. 2151.414 permits court to consider child's wishes as child directly expresses or through the guardian ad litem).

### 3

### Custodial History

{¶ 56} The child lived in her parents' home until May 2014, when she was approximately 11 years old.   Since that time, she has lived in the same foster home.   At the time appellee filed its permanent custody motion, the child had been in appellee's continuous temporary custody for more than twelve out of the past twenty-two months.

### 4

### Legally Secure Permanent Placement

{¶ 57} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016–Ohio–793, 2016 WL 818754, ¶56, citing *In re Dyal,* 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.,* 10th Dist. Franklin Nos. 15AP–64 and 15AP–66, 2015–Ohio–4682, ¶28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.,* 11th Dist. Lake No. 2012–L–126, 2013–Ohio–1293, ¶95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); *In re J.W.,* 171 Ohio App.3d 248, 2007–Ohio–2007, 870 N.E.2d

245, ¶34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"); Black's Law Dictionary 1354 (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* at 1139 (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.* at ¶56.

{¶ 58} In the case sub judice, after our review we believe that the record contains abundant clear and convincing evidence to support the trial court's finding that the child needs a legally secure permanent and that she cannot achieve this type of placement without granting appellee permanent custody. We initially note that the mother courageously admitted that her mental health does not allow her to provide the child with proper care and that she would like the child to be placed in appellee's permanent custody. Thus, the mother cannot provide the child with a legally secure permanent placement.

{¶ 59} Appellant claims that he can provide the child with a legally secure permanent placement. The evidence, however, suggests otherwise. Appellant's physical home environment may be appropriate, but he has not taken the actions needed to address appellee's safety concerns. Appellant did not complete a mental health evaluation that would have allowed appellee to tailor a plan that would help eliminate the safety threats in the home. Appellee had concerns that physical and sexual abuse had occurred in the home, as well as possible deprivation

and starvation. Appellant did not undertake any steps that would have allowed appellee to determine whether appellant had eliminated or reduced those potential threats. Most tellingly, the child stated that she does not feel safe in appellant's home. Consequently, although appellant's home environment may be physically appropriate, he has not shown that the environment is one in which the child will feel safe and where her needs will be met. Additionally, appellee explored other placements but none were approved as legally secure permanent placements. We therefore believe that the evidence supports the trial court's finding that the child needs a legally secure permanent placement.

5

Substantial Compliance With Case Plan

{¶ 60} Although not specified as a best-interest factor in R.C. 2151.414(D)(1), appellant nevertheless asserts that he substantially complied with the case plan by completing a parenting course and by obtaining an evaluation through Dr. Dunn. Appellant alleges that his case plan compliance demonstrates that the child can be placed with him. Caseworker Herron testified, however, that Dr. Dunn's evaluation did not constitute the type of mental health evaluation specified in the case plan and that appellee repeatedly advised appellant of the importance of obtaining a mental health evaluation. Herron indicated that Dr. Dunn's evaluation did not adequately inform appellee so that it could devise a proper reunification plan or attempt to eliminate the safety issues in the home. Herron further testified that she advised appellee that Dr. Dunn's evaluation did not satisfy the case plan requirement. Moreover, Dr. Dunn stated that he would have evaluated appellant in a different manner if appellant had disclosed that he sought the evaluation due to appellee's involvement. Dr. Dunn explained that he does not focus on

familial relationships and that he may have referred appellant to a different provider. We therefore disagree with appellant that he substantially complied with the mental-health-evaluation requirement.

{¶ 61} Furthermore, we note that the trial court would not have been precluded from granting appellee permanent custody, even if appellant had substantially complied with the case plan. A parent's "substantial compliance with a case plan, in and of itself, does not prove that a grant of permanent custody to an agency is erroneous." *In re A.C-B.*, 9th Dist. Summit Nos. 28330 and 28349, 2017-Ohio-374, 2017 WL 440116, ¶11, citing *In re M.Z.*, 9th Dist. No. 11CA010104, 2012–Ohio–3194, ¶19; *In re K.J.*, 4th Dist. Athens No. 08CA14, 2008–Ohio–5227, ¶24 (stating that "when considering a R.C. 2151.414(D)(1)(d) permanent custody motion, the focus is upon the child's best interests, not upon the parent's compliance with the case plan"). A parent's case plan compliance may be relevant to the extent that it affects the child's best interest. *E.g.*, *In re T.J.*, 4th Dist. Highland No. 2016–Ohio–163, 2016 WL 228187, ¶36, citing *In re R.L.*, 9th Dist. Summit Nos. 27214 and 27233, 2014–Ohio–3117, ¶34 (stating that "although case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it"). A parent's case plan compliance does not, however, preclude a trial court from awarding permanent custody to a children services agency when doing so is in the child's best interest. *Id.*, citing *In re N.L.*, 9th Dist. Summit No. 27784, 2015–Ohio–4165, ¶35 (stating that "substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous"); *In re S.C.*, 8th Dist. Cuyahoga No. 102349, 2015–Ohio–2280, ¶40 ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification."); *In re W.C.J.*, 4th Dist. Jackson No. 14CA3,

2014–Ohio–5841, ¶46 ("Substantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency."). "Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, 'it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights.'" *W.C.J.* at ¶46, quoting *In re Gomer,* 3d Dist. Wyandot Nos. 16–03–19, 16–03–20, and 16–03–21, 2004–Ohio–1723, ¶36. Consequently, we disagree with appellant that his alleged case plan compliance means that the court could not grant appellee permanent custody of the child.

F

REASONABLE EFFORTS

{¶ 62} Within his first assignment of error, appellant asserts that appellee failed to use reasonable efforts to eliminate the child's continued removal from the home, and thus, that the trial court could not grant appellee permanent custody. We do not agree.

{¶ 63} R.C. 2151.419(A)(1) requires a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children * * *." *C.F., supra*, at ¶41; *accord In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016–Ohio–916, 2016 WL 915012, ¶72. Thus, "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'"

*C.F.* at ¶41, quoting *In re A.C.*, 12th Dist. Clermont No. CA2004–05–041, 2004–Ohio–5531, ¶30. Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody. *Id.* at ¶42. Instead, at prior "stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification." *Id.* Additionally, "[if] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶43.

{¶ 64} In the case at bar, appellant's appeal does not originate from one of the types of hearings specifically listed in R.C. 2151.419(A): "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children." Appellee, therefore, was not required to prove at the permanent custody hearing that it used reasonable efforts to reunify the family, unless it had not previously done so. In the case sub judice, the record reflects that the trial court made reasonable efforts findings before appellee filed its permanent custody motion. Thus, the court did not need to again find that appellee used reasonable efforts before it could grant appellee permanent custody. *In re S.S.*, 4th Dist. Jackson Nos. 16CA7 and 16CA8, 2017-Ohio-2938, 2017 WL 2256777, ¶168. We note, however, that the court did enter a reasonable efforts finding in its permanent custody decision.

{¶ 65} Appellant additionally challenges the trial court's finding that appellee used reasonable efforts. We question whether this is a proper issue to consider in an appeal from an R.C. 2151.413 permanent custody motion when a prior reasonable efforts finding had been made at an "adjudicatory, emergency, detention, [or a] temporary-disposition hearings, [or] dispositional hearings for abused, neglected, or dependent children." Nevertheless, given the

importance of the parental rights involved, we will consider the matter.

{¶ 66} We discussed the meaning of "reasonable efforts" in *C.B.C.*, *supra*, at ¶76, as

follows:

> In general, "reasonable efforts" mean "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.'" *C.F.* at ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation,* 12 B.U.Pub.Int.L.J. 259, 260 (2003). "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.,* 3d Dist. Wyandot Nos. 16–12–15 and 16–12–16, 2013–Ohio–4317, ¶95, quoting *In re D.A.,* 6th Dist. Lucas No. L–11–1197, 2012–Ohio–1104, ¶30. In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification. Bean, *Reasonable Efforts: What State Courts Think,* 36 U. Tol. L.Rev. 321, 366 (2005), quoting *In re Child of E.V.,* 634 N.W.2d 443, 447 (Minn.Ct.App.2001), and *In re K.L.P.,* No. C1–99–1235, 2000 WL 343203, at *5 (Minn.Ct.App. Apr. 4, 2000) (explaining that the agency must address what is "necessary to correct the conditions that led to the out-of-home placement" and must "provide those services that would assist in alleviating the conditions leading to the determination of dependency"). However, "'[r]easonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re Lewis,* 4th Dist. Athens No. 03CA12, 2003–Ohio–5262, ¶ 16. Furthermore, the meaning of "reasonable efforts" "will obviously vary with the circumstances of each individual case." *Suter v. Artist M.,* 503 U.S. 347, 360, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Additionally, "[i]n determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

{¶ 67} In the case at bar, the record shows that appellee used reasonable efforts.

Appellee provided appellant with a case plan that informed him of the activities to complete in

order to attempt reunification. Appellee also permitted visitation between appellant and the

child and ensured that the child received counseling. Appellant completed a parenting course,

but he did not complete a mental health evaluation, despite appellee's repeated emphasis on its

importance. While appellant contends that appellee should have done more to ensure that he fully understood the type of mental health evaluation he needed to obtain, appellant cannot show that appellee's efforts fell short of reasonable. Furthermore, appellant's dishonesty with Dr. Dunn might suggest that appellant attempted to circumvent the mental health evaluation requirement, instead of suggesting that he simply failed to understand the requirement to obtain a mental health evaluation. Consequently, we disagree with appellant that appellee failed to use reasonable efforts.

{¶ 68} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II

INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 69} In his second assignment of error, appellant argues that he did not receive the effective assistance of counsel. Appellant contends that his trial counsel was ineffective for failing to object to inadmissible hearsay statements. Specifically, appellant asserts that trial counsel was ineffective for failing to object to the following statements: (1) the child was absent 35 days and tardy 5 days throughout the 2012-2013 school year, and was absent 44 days and tardy 19 days during the 2013-2014 school year; (2) the child alleged sexual abuse during an interview with caseworkers; (3) the mother claimed that appellant and his brother had been drugging her, that appellant was extremely controlling and required her and the child to obtain his permission to eat food or to use toilet paper, and that appellant had been violent with both her and the child; (4) the mother stated that she had a nervous breakdown from worrying whether appellant sexually abused the child; (5) the child alleged that appellant's sister took naked

photographs of the child; (6) the child alleged appellant entered her bedroom at night and touched her vagina; (7) the child reported that the father licked her on the mouth; (8) the caseworker testified that the child was extremely fearful of appellant and his brother; and (9) the child's foster parent stated that the child informed him and the foster mother that her father touched her inappropriately.

{¶ 70} Appellant concedes that the child's counselor could offer hearsay testimony under an exception to the hearsay rule. He asserts, however, that the counselor's testimony, by itself, does not sufficiently support the trial court's decision to grant appellee permanent custody. Appellant claims that the counselor's testimony was "minimal and equivocal until buttressed by the extensive hearsay claims against [appellant]." He thus asserts that trial counsel's alleged deficient performance affected the outcome of the proceeding. We disagree.

{¶ 71} The right to counsel, guaranteed in permanent custody proceedings by R.C. 2151.352 and by Juv.R. 4, includes the right to the effective assistance of counsel. *In re Wingo*, 143 Ohio App.3d 652, 666, 758 N.E.2d 780 (4th Dist.2001), citing *In re Heston,* 129 Ohio App.3d 825, 827, 719 N.E.2d 93 (1st Dist.1998); *e.g., In re J.P.B.*, 4th Dist. Washington No. 12CA34, 2013–Ohio–787, 2013 WL 839932, ¶23; *In re K.M.D.,* 4th Dist. Ross No. 11CA3289, 2012–Ohio–755, ¶60; *In re A.C.H.,* 4th Dist. Gallia No. 11CA2, 2011–Ohio–5595, ¶50. "'Where the proceeding contemplates the loss of parents' 'essential' and 'basic' civil rights to raise their children, * * * the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody.'" *Id.,* quoting *Heston.*

{¶ 72} To establish constitutionally ineffective assistance of counsel, a defendant must

show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *E.g., Strickland,* 466 U.S. at 687; *State v. Obermiller,* 147 Ohio St.3d 175, 2016–Ohio–1594, 63 N.E.3d 93, ¶83; *State v. Powell,* 132 Ohio St.3d 233, 2012–Ohio–2577, 971 N.E.2d 865, ¶85. "Failure to establish either element is fatal to the claim." *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008–Ohio–968, ¶14. Therefore, if one element is dispositive, a court need not analyze both. *State v. Madrigal,* 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000) (stating that a defendant's failure to satisfy one of the elements "negates a court's need to consider the other").

{¶ 73} The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla v. Kentucky,* 559 U.S. 356, 366, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), quoting *Strickland,* 466 U.S. at 688; *accord Hinton,* 134 S.Ct. at 1088. "Prevailing professional norms dictate that with regard to decisions pertaining to legal proceedings, 'a lawyer must have "full authority to manage the conduct of the trial."'" *Obermiller* at ¶85, quoting *State v. Pasqualone,* 121 Ohio St.3d 186, 2009–Ohio–315, 903 N.E.2d 270, ¶24, quoting *Taylor v. Illinois,* 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). Furthermore, "'[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.'" *Hinton,* 134 S.Ct. at 1088, quoting *Strickland,* 466 U.S. at 688. Accordingly, "[i]n order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway,* 109 Ohio St.3d 412, 2006–Ohio–2815, 848 N.E.2d 810, ¶95 (citations omitted); *accord Hinton,* 134 S.Ct. at

1088, citing *Padilla,* 559 U.S. at 366; *State v. Wesson,* 137 Ohio St.3d 309, 2013–Ohio–4575, 999 N.E.2d 557, ¶81.

{¶ 74} Moreover, when considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* Additionally, "[a] properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor,* 4th Dist. Washington No. 07CA11, 2008–Ohio–482, ¶10, citing *State v. Smith,* 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed * * * by the Sixth Amendment." *Strickland,* 466 U.S. at 687; *e.g., Obermiller* at ¶84; *State v. Gondor,* 112 Ohio St.3d 377, 2006–Ohio–6679, 860 N.E.2d 77, ¶62; *State v. Hamblin,* 37 Ohio St.3d 153, 156, 524 N.E.2d 476 (1988).

{¶ 75} To establish prejudice, a defendant must demonstrate that a reasonable probability exists that "'but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the outcome.'" *Hinton,* 134 S.Ct. at 1089, quoting *Strickland,* 466 U.S. at 694; *e.g., State v. Short,* 129 Ohio St.3d 360, 2011–Ohio–3641, 952 N.E.2d 1121, ¶113; *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus. Furthermore, courts may not simply assume the existence of prejudice, but must require the defendant to affirmatively establish prejudice. *State v. Clark,* 4th Dist. Pike No. 02CA684, 2003–Ohio–1707, ¶22; *State v. Tucker,* 4th Dist. Ross No.

01CA2592 (Apr. 2, 2002). As we have repeatedly recognized, speculation is insufficient to demonstrate the prejudice component of an ineffective assistance of counsel claim. *E.g., State v. Jenkins,* 4th Dist. Ross No. 13CA3413, 2014–Ohio–3123, ¶22; *State v. Simmons,* 4th Dist. Highland No. 13CA4, 2013–Ohio–2890, ¶25; *State v. Halley,* 4th Dist. Gallia No. 10CA13, 2012–Ohio–1625, ¶25; *State v. Leonard,* 4th Dist. Athens No. 08CA24, 2009–Ohio–6191, ¶68; *accord State v. Powell,* 132 Ohio St.3d 233, 2012–Ohio–2577, 971 N.E.2d 865, ¶86 (stating that an argument that is purely speculative cannot serve as the basis for an ineffectiveness claim).

{¶ 76} In the case at bar, assuming, arguendo, that trial counsel performed deficiently by failing to object to the alleged hearsay statements, we do not believe that appellant can show that a reasonable probability exists that the result of the proceeding would have been different in the absence of the objectionable statements. If trial counsel had objected, and if the trial court had sustained the objections, the record contains ample other evidence to support the trial court's decision that granting appellee permanent custody is in the child's best interest.

{¶ 77} Appellant agrees that the child's counselor's testimony concerning the child's statements fall within an exception to the hearsay rule.[4] The counselor's testimony contains numerous examples of statements the child made concerning her fear of appellant and suggesting that appellant sexually abused her. For instance, when the counselor first interviewed the child, the child stated that she was "glad" that appellant still was in jail so that she would not "have to

---

[4] Appellant asserts that the counselor's testimony falls within the exception specified in Evid.R. 803(4). The rule provides that the following statements are exclusions to the hearsay rule: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Due to appellant's concession, we have no need to evaluate whether the counselor's statements fall within this exclusion. Rather, we assume, arguendo, that her statements fall within the exclusion.

worry about him hurting [her] again." Moreover, the counselor stated that the child informed

her that she did not like "being touched down there" and pointed between her legs. The child

stated that appellant "touched [her] down there" and that "sometimes it hurts." The counselor

also explained that she believes that the child had suffered sexual abuse in appellant's home and

believes that appellant was the perpetrator. The counselor further indicated that the child stated

she does not feel safe in appellant's home.

{¶ 78} Furthermore, the child's mother, through her guardian ad litem, expressed her

wish that appellee obtain permanent custody of the child so that the child could remain in the

same foster home. The child's mother further relayed through her guardian ad litem that she did

not want appellant to have custody of the child. Appellant has not argued that the mother's

guardian ad litem's statements constitute inadmissible hearsay.

{¶ 79} Additionally, the caseworker testified that appellant's completion of a mental

health evaluation was vital to implementing a reunification case plan. She stated that a mental

health evaluation would have allowed appellee to determine how to address the safety concerns

with appellant's home. The caseworker stated that without a mental health evaluation, appellee

could not develop a safe plan to return the child to appellant's home. Appellant did not,

however, complete a mental health evaluation, even when appellee explained its importance to

him.

{¶ 80} Thus, even without the alleged hearsay statements, we believe that the foregoing

evidence combines to create more than ample competent and credible to support the trial court's

decision to award appellee permanent custody. Consequently, appellant cannot establish that

any alleged deficiency in counsel's failure to object to hearsay affected the outcome of the

proceedings.  *See In re J.P.B.*, 4th Dist. Washington No. 12CA34, 2013-Ohio-787, 2013 WL 839932, ¶46.

{¶ 81} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the judgments be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court, Juvenile Division, to carry these judgments into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

McFarland, J. & Hoover, J.: Concur in Judgment & Opinion

For the Court

BY:_____<br>Peter B. Abele, Judge

# <u>NOTICE TO COUNSEL</u>

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.